### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**DOREEN ANTONIO,**

        **Plaintiff,**

**v.**                                                                 **Case No.  8:06-cv-338-T-TBM**

**MICHAEL J. ASTRUE[1],**
**Commissioner of the United States**
**Social Security Administration,**

        **Defendant.**

_____/

## O R D E R

       The Plaintiff seeks judicial review of the denial of her claim for Social Security disability benefits.  For the reasons set out herein, the decision is reversed and remanded.

### I.

       Plaintiff was forty-four years of age at the time of her administrative hearing in April 2003.  She stands 5', 8" tall and weighed 190 pounds.  Plaintiff has a twelfth grade education and vocational training in animal husbandry.  Her past relevant work was as a community involvement assistant for a school board, teacher's assistant, and cafeteria aide.  Plaintiff applied for disability benefits in October 2001, alleging disability as of April 23, 1999, by reason of reflex sympathetic dystrophy of the left ankle and leg, pain in the neck and lower

---

[1]Michael J. Astrue became Commissioner of Social Security on February 12, 2007.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted for Commissioner Jo Anne B. Barnhart as Defendant in this suit.

back, and depression/anxiety.  The Plaintiff's application was denied originally and on reconsideration.

      The Plaintiff, at her request, then received a *de novo* hearing before an Administrative Law Judge ("ALJ").  The Plaintiff was represented at the hearing by counsel and testified in her own behalf.  Additionally, a vocational expert was called by the ALJ.  In essence, Plaintiff testified that she has been unable to work since she sustained a work-related injury to her left ankle (in 1993).  She suffers from reflex sympathetic dystrophy ("RSD") in her left leg with resultant constant pain, muscle spasms, and numbness.  She has fallen due to her leg "giving out."  Sitting, standing and walking aggravate the condition.  Various efforts at treatment have resulted in only slight relief.  According to Plaintiff, she has been using a cane 98% of the time for the last three years.  Since 1994, she has used an electric scooter when there is going to be a lot of walking.  Plaintiff was in two car accidents, with both requiring surgery on her left shoulder.  She has 25% limitation in her range of motion in that shoulder.  She indicated that since the accidents, she has headaches at least twice a week that require her to take medication, use ice and lie down for at least an hour.  While her pain is constant, it varies in intensity.  Some days she cannot get out of bed, other days it starts at a level 3 or 4 but increases to 7 to 10 as the day progresses.  She describes the pain as "severe," "burning," and "shooting."  By her account, she has bad days about four days a week.

      Plaintiff also suffers from depression and is currently taken Zoloft, which helps.  She has experienced a loss of interest in most activities as well as a decrease in energy.  She has feelings of worthlessness and thoughts of suicide.  She also has difficulty concentrating and thinking.  Some days, she does not want to go out of the house.

Plaintiff indicated that she can lift five pounds but lifting a gallon of milk with both hands causes discomfort.  She can walk five to ten minutes but then her legs start to hurt and cramp up.  She can sit for ten minutes or so but sitting causes her back to hurt and her legs to swell, go numb and become weak..  She can bend a little but is unable stoop or squat.  She can go up stairs but not down. She cannot reach overhead with her left arm.  She drives a car for short trips but has panic attacks and usually has someone go with her.  In a typical day, she spends a lot of time lying on her right side with legs up.  Plaintiff's daughter and a couple of friends assist with most of the housework and grocery shopping.  Plaintiff indicated she wakes up throughout the night and gets maybe three to four hours sleep at one time.  <u>See</u> Plaintiff's testimony (R. 717-40).

Dr. Steven Limon, a vocational expert ( "VE"), testified upon an assumption of a person of Plaintiff's age, education and work experience with the residual functional capacity for a limited range of light work with limitations for never climbing ladders, scaffolds, working around moving machinery and unprotected heights and hazards, and occasional limitations for balancing, stooping, crouching, kneeling, crawling and overhead reaching with the left upper extremity, and lifting and carrying only 15 pounds occasionally and 10 pounds frequently.  According to the VE, such person could perform Plaintiff's past work as a volunteer coordinator as such work is generally performed in the national economy but not as actually performed by the Plaintiff.  Additionally, such person could work as a telephone information clerk, and  receptionist and information clerk.  If the claimant consistently missed two days or more a month for six months, no such work would be available for her.  <u>See</u> VE's testimony (R. 741-45).

Also before the ALJ were medical records outlining the Plaintiff's medical history. These matters are well briefed in the parties' memoranda and are set forth herein as necessary.

By his decision of September 30, 2003, the ALJ determined that while Plaintiff has severe impairments related to myofascial pain syndrome, left shoulder arthroscopy, an affective disorder, RSD of the left leg and ankle, and chronic neck and lower back pain, she nonetheless had the residual functional capacity to perform a restricted range of light exertional work.  Upon this finding, the ALJ concluded that Plaintiff could perform her past work as a volunteer coordinator, teacher's aide, and kitchen helper.  Upon this conclusion, the Plaintiff was determined to be not disabled.  (R. 20-30).  The Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner.


II.

In order to be entitled to Social Security disability benefits a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months. . . ."  42 U.S.C. § 423(d)(1)(A).  A "physical or mental impairment," under the terms of the Act, is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  Id. at § 423(d)(3).

A determination by the Commissioner that a claimant is not disabled must be upheld if it is supported by substantial evidence and comports with applicable legal standards. See id. at § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996). The Commissioner must apply the correct law and demonstrate that he has done so. While the court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions. Keeton v. Dep't of Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994) (citing Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991)).

It is, moreover, the function of the Commissioner, and not the courts, to resolve conflicts in the evidence and to assess the credibility of the witnesses. Grant v. Richardson, 445 F.2d 656 (5th Cir. 1971). Similarly, it is the responsibility of the Commissioner to draw inferences from the evidence, and those inferences are not to be overturned if they are supported by substantial evidence. Celebrezze v. O'Brient, 323 F.2d 989 (5th Cir. 1963). Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the court is not to re-weigh the evidence, but is limited to determining whether the record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that the claimant is not disabled. Miles, 84 F.3d at 1400; Bloodsworth v. Heckler, 703 F.2d 1233 (11th Cir. 1983).

The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct legal standards

were applied.  <u>McRoberts v. Bowen</u>, 841 F.2d 1077, 1080 (11th Cir. 1988); <u>Boyd v. Heckler</u>, 704 F.2d 1207, 1209 (11th Cir. 1983).

III.

The Plaintiff raises two claims on this appeal.  As stated by the Plaintiff, they are as follows:

(1) Did the ALJ Properly Consider the Opinion of a Treating Physician? and

(2) Does New Material Evidence Submitted to the Appeals Council, Including the Opinion of a Treating Physician, Justify Remand of this Case?

By her first claim, Plaintiff complains that the ALJ did not fully credit the testimony of treating orthopedist, Theodore P. Vlahos, M.D.  The record reveals that Dr. Vlahos treated Plaintiff after each of her automobile accidents.  In October 2002, his Final Report indicated Plaintiff suffered from aggravation of previous cervical strain/sprain, new onset of cervical disc bulge at C6-7 and C5-6 with persistent cervical radiculopathy down her left arm, aggravation of left shoulder acromioclavicular synovitis and arthritis post arthroscopic surgery, severe thoracic strain/sprain with still persistent symptoms, severe lumbrosacral strain/sprain with still persistent symptoms, and sacroiliitis.  (R. 590).  He opined that she would require visits to a massage therapist, chiropractor or physical therapist at least once a week and frequent visits to an orthopaedist, neurologist and pain management specialist for "injections of various types, medications, etc."  (R. 591).  He concluded Plaintiff had a disability rating of 15% for her cervical spine and 10% for her lumbar spine, for a total body impairment of 25%.  <u>See</u> (R. 587-91).  His report noted that she was "quite disabled."  <u>Id.</u>

6

Inferring from this assessment that Plaintiff would necessarily miss considerable work and coupling that conclusion with the VE's testimony that Plaintiff could not maintain gainful employment if she missed four or more days of work a month (or two days per month for six months) for treatment, Plaintiff urges that she is unable to engage in substantial gainful activity and is entitled to a reversal and an award of benefits.

When considering a treating physician's testimony, the ALJ must ordinarily give substantial or considerable weight to such testimony unless good cause is shown to the contrary. Broughton v. Heckler, 776 F.2d 960, 961 (11th Cir. 1985); see also 20 C.F.R. § 404.1527(d)(2). Furthermore, the ALJ must specify the weight given to the treating physician's opinion or reasons for giving the opinion no weight, and the failure to do so is reversible error. In this circuit, where the Commissioner has ignored or failed properly to refute the treating physician's testimony, such testimony, as a matter of law, must be accepted as true. MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986). Such a preference is given to treating sources because such sources are likely to be best situated to provide a detailed and longitudinal picture of the medical impairments. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause for rejecting a treating source's opinion may be found where such opinion is not supported by the evidence or where the evidence supports a contrary finding. Id.; Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).

After careful review of this relatively voluminous medical record, I conclude that Plaintiff is not entitled to relief on this claim. First, this doctor did not render an express opinion about the amount of work Plaintiff would miss for treatment and Plaintiff's inference that he did reaches too far. Second, the decision reveals that the ALJ fairly acknowledged Dr.

Vlahos's assessments along with those reports and records of several other treating doctors. By the ALJ's evaluation, the medical record as a whole did not reveal Plaintiff to be incapable of performing all work.  I have reviewed the records from the various treating and examining doctors and find that the ALJ's conclusion in this regard is supported by substantial evidence.

While it is apparent that the ALJ disagreed with Dr. Vlahos's disability statement, it appears to me that the ALJ otherwise considered and weighed all the treating doctors' assessments of the effect of Plaintiff's shoulder injury on her ability to lift and carry and reach overhead with her left arm, including Dr. Vlahos's.  Contrary to Plaintiff's urging, Dr. Vlahos's conclusion that Plaintiff had a 25% impairment rating did not dictate a conclusion that Plaintiff was disabled as such term is defined under the Act, especially when the records are read in the context of the entire medical record.  As this doctor's notes reveal and as his final report reflected, Plaintiff's condition called for conservative care and further pain management.  The doctor's statement that Plaintiff was "quite disabled" is not correlated to any of his clinical findings, and in any event speaks to an issue that is left to the ALJ to decide.  Here, a fair reading of the full decision reflects that the ALJ fairly evaluated the findings of Dr. Vlahos as well as several other treating doctors whose reports permitted the ALJ to reach a different disability conclusion.  As reflected in the decision, Plaintiff's treatment history began in 1993 and concerned her suspected RSD and pain subsequent to an on-the-job injury.  The reports and records before and after Plaintiff's alleged onset date supported that Plaintiff was not disabled from all work by reason of her RSD.  Dr. V.I. Batas, who treated Plaintiff in 1995 and 1997 for RSD, noted in September 1997 that Plaintiff could return to work on permanent, limited light duty work status.  (R. 291-97).  Dr. Maria Wilson,

a treating doctor at Tampa General Hospital, treated Plaintiff for complaints related to both

her leg and back pain as well as her shoulder pain.  Significantly, this doctor's treatment notes

reflect concerns with functional overlay and Plaintiff's dependence on narcotic pain

medicines.  After considerable efforts with the Plaintiff, in March 2001, the doctor noted there

was little more she could do and Plaintiff should return to work as a teacher's assistant, with

some limitations.  (R. 300).  Treatment notes from neurologist, Dr Jairo D. Libreros-Cupido,

who began treating Plaintiff after her second automobile accident in September 2001 and

continued to see her into 2003, simply did not reflect clinical or objective findings consistent

with the Plaintiff being disabled from all work.  See (R. 418-459, 592-96).[2]  Clearly, nothing

in the orthopedic records from Dr. Van Winkle (R. 389-94) or Dr. Demetrios Kaiafas (R. 411-

16), who saw Plaintiff on a referral from Dr. Vlahos, suggested a disabling condition.  Karen

C. Lenhart, M.D., a psychiatrist, addressed Plaintiff's depression conservatively with

counseling and medication between 1997 and 2000.  Her notes can be read to support that the

depression was maintained with the medication.  As noted by the ALJ, a consultative

psychological evaluation by Steven N. Kanakis, Psy.D., did not suggest disabling mental

functional limitations from the depression.  See (R. 386-88).

　　　　It is the function of the Commissioner to evaluate the evidence and to resolve

conflicts therein.  If the conclusions of the ALJ are supported by substantial evidence, this

court may not disturb them.  Here, the medical evidence as a whole supports the ALJ's

---

[2]As discussed below, additional records from this doctor were presented to the
Appeals Council along with MRI results.  Dr. Libreros-Cupido's notes reflect on some
additional MRI evidence and his  continued conservative care for the Plaintiff.

conclusions as to the Plaintiff's functional capacity for work.  Even accepting that Plaintiff

needed the continued conservative care as indicated by Dr. Vlahos, it is nowhere

demonstrated that such care would cause Plaintiff to miss work with such regularity that she

could not maintain gainful employment.  I decline to speculate that it would.

By her second claim, Plaintiff urges that new and material evidence arising

subsequent to the decision warrants a remand for further consideration by the ALJ.[3]  In

particular, Plaintiff urges that a cervical MRI taken in December 2003 revealed bulging discs

and a right side herniation at C6-7 and neurodiagnostic studies suggested C5-6

radiculopathy.[4]  In January 2004, Dr Colbassani performed a cervical discectomy, fusion, and

plating at C6-7. See (R. 625-26).  By Plaintiff's argument, these conditions existed prior to

the date of decision but had not been clearly exposed through the clinical or objective

evidence.  Plaintiff maintains that the new evidence, which confirms a herniated disc,

contradicts the ALJ's conclusions regarding the severity of her spinal problems and likely

would have altered the administrative result.  Accordingly, the Plaintiff seeks a remand for

---

[3]It appears that on or about November 9, 2004, counsel for Plaintiff forwarded a
packet of additional medical records to the Appeals Council for its consideration  See (R.
709).  They are found in the record beginning at page 619.  See (R. 619-708).

[4]Numerous MRIs were taken in December 2003.  See (R. 702-08).  One suggested a 4
mm right central extrusion at C6-7 with 5% cord indentation (R. 702), another suggested
bulging at C3-4 and C5-6 and a 2 mm right central protrusion at C6-7, slightly larger and
more apparent than on October 11, 2001 [scan], indenting cord about 5%.  (R. 705).  In
contrast, the myelogram and CT scan of the cervical spine in June 2003 revealed only
minimal evidence of disc disease at C5-6 and no other significant issue in the cervical spine.
See (R. 629-31).  The reference to neurodiagnostic studies suggestive of C5-6 radiculopathy
is found in a report by Dr. Colbassani.  (R. 620)..

consideration of this additional evidence.  The Commissioner merely responds that he considered the evidence and found no basis for further review.[5]

In this circuit, a remand for consideration of new evidence is appropriate where the Plaintiff demonstrates that: (1) there is new, non-cumulative evidence; (2) the evidence is material such that a reasonable possibility exists that it would change the administrative result; and (3) there is good cause for the failure to submit the evidence at the appropriate administrative level.  See Falge v. Apfel, 150 F.3d 1320, 1323 (11th Cir.1998); see also Keeton, 21 F.3d at 1067.

While this a close issue, I find that the MRIs taken in December 2003 and the surgical records and the report of Dr. Colbassani from January 2004 were new and noncumulative evidence, revealing a worsening of the condition in Plaintiff's cervical spine and providing a clearer etiology for some of Plaintiff's pain complaints.  Further, there is "good cause" for the late submission of these matters as they were unavailable prior to the ALJ's decision.[6]  The only issue is whether the new evidence is material under the new evidence standard.

_____

[5]The Appeals Council determined that the updated medical evidence revealed exacerbations of symptoms in April 2003, a diagnosis of herniated disc at C6-7, and a surgical procedure in January 2004.  It noted that the day following the surgery, Plaintiff reported feeling much improved.  It then concluded "there is no evidence that this exacerbation in your condition lasted for a period of twelve months or more, or resulted in functional limitations beyond those found by the [ALJ]."  (R. 4).

[6]Plaintiff demonstrates no good cause for having failed to submit the records from (1) Mease Dunedin Hospital for the period between April 28, 2003, and the date of decision, September 30, 2003, (2) the records of Dr. Imtiaz Hossain from February 13, 2003, through August 13, 2003, (3) the records of Dr. Libreros-Cupido from February 11, 2003, through September 2, 2003, and (4) the report of Dr. Colbassani from June 13, 2003.

In support of the request for remand, Plaintiff cites to the decision in <u>Vega v. Comm'r of Soc. Sec.</u>, 265 F.3d 1214 (11th Cir. 2001). There, the court found evidence of a herniated disc and corrective surgery performed after the ALJ's decision was new evidence that required a remand because it contradicted the findings and conclusions of the ALJ on the severity of Vega's spinal condition. <u>See id.</u> at 1218-19. In principle, that case dictates the proper result here because the new evidence redefined the nature of Plaintiff's spinal problems and calls into question, if not contradicts, the ALJ's conclusions as to the severity of Plaintiff's cervical spine injury.[7] As such, it is relevant and material as such term is defined by this circuit's standard. In my view, the evidence dictated that the Appeals Council grant the request for review and reopen the matter for further consideration of the import of this new evidence on the Plaintiff's functional capacity. While the Appeals Council is correct that the new evidence did not speak to the matter of functional limitations, it appears the reasonable conclusion that the surgical procedure employed here, which excised the disc and employed a graft and a cervical plate to secure the spine, would alter Plaintiff's functional capacity in a significant way not considered at the administrative level. Thus, the better course is to remand the case for further consideration by the ALJ of the new evidence.

---

[7]It is probative evidence because it demonstrates a worsening of Plaintiff's condition and would dictate the ALJ address the injury in a different way. A MRI in October 2001 had revealed minimal bulging at C5-6 and mild osteophytic ridging, "slightly more prominent bulging of the disc at C6-7, broad based and central in nature, without focal protrusion," and "intrinsically normal cord. No stenosis." (R. 449). As noted above, the MRIs in December 2003 clearly revealed evidence of a right-sided disc herniation in C6-7. (R. 620). As described by Dr. Colbassani in his surgical report, ". . .diagnostic studies revealed only a small protrusion of the C6-7 disc over time this continued to weaken and then frankly ruptured more recently confirmed by recent MRI scan." (R. 625).

IV.

For the foregoing reasons, this matter is remanded pursuant to Sentence Six of

Section 405(g) for further proceedings before the Commissioner consistent with this Order.

The Clerk is directed to administratively close the case.

**Done and Ordered** at Tampa, Florida, this 20th day of July 2007.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of record

13